[Civ. No. 6907. Fifth Dist. Oct. 18, 1983.]

Guardianship of CLARALYN S., a Minor.
SAM E. et al., Plaintiffs and Appellants, v.
GARY S., Defendant and Respondent;
DONALD N. STAHL, as District Attorney, etc.,
Real Party in Interest and Respondent.

## COUNSEL

Strauss, Neibauer, Anderson & Hollenback and John J. Hollenback, Jr., for Plaintiffs and Appellants.

Goss, Solano & Reynolds and Donald R. Reynolds for Defendant and Respondent.

John K. Van de Kamp, Attorney General, James T. McNally and James Ching, Deputy Attorneys General, for Real Party in Interest and Respondent.

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Judith W. Allen, Deputy State Public Defender, for Minor.

## OPINION

**ZENOVICH, J.**—In this appeal we are called upon to determine whether grandparents can collaterally attack the paternity of their grandchild after

the purported father's stipulation to paternity in prior actions brought by the county for reimbursement of public assistance expended for the support of the child.

Gary S. and Ranona S. lived together for some time prior to early 1975 when a separation occurred and Ranona went to Wisconsin. Thereafter, Ranona returned to California and advised Gary that she was pregnant and he was the father of the child. Although Gary was suspicious, he apparently wanted to believe that the child was his. The child, Claralyn B., was born on October 31, 1975. Ten months later, on September 4, 1976, Gary and Ranona were married and stayed together until September 1977, when they separated.

On September 25, 1977, based upon an agreement for entry of judgment of paternity and child support pursuant to Welfare and Institutions Code sections 11475.1 and 11476.1, the court entered its judgment and order finding that Gary was the natural father of Claralyn.

Thereafter, on November 30, 1977, now having reconciled, Ranona and Gary petitioned the court to change the name of the child from Claralyn B. to Claralyn S. Both Gary and Ranona signed the petition under penalty of perjury that they were in fact the parents of the minor child. Pursuant to law, the superior court did, in fact, enter a decree changing the name of the child to Claralyn S. on January 5, 1978.

On September 20, 1978, the Superior Court of the County of Stanislaus entered judgment against Gary for establishment of child support and reimbursement of public assistance pursuant to Welfare and Institutions Code section 11350. The county and Gary had entered into a stipulation for entry of judgment. The parties stipulated that Gary was the father of Claralyn and that Ranona was the natural mother of Claralyn.[1]

On January 23, 1980, Gary filed a petition for dissolution of his marriage with Ranona. In this petition, Gary alleged that he was the father of the child.

On February 15, 1981, Sam E. and Erma E., the maternal grandfather and stepgrandmother of Claralyn, filed a petition for appointment of guardian of Claralyn. The unfortunate facts of the instant case reveal that both Gary and Ranona had been in and out of custody on numerous occasions for drug violations. Indeed, at the time of the petition for guardianship, Ranona was, in fact, incarcerated for such a violation.

---

[1]The record reveals that while Gary was informed of his right to have counsel in the prior actions brought by the county, he nonetheless proceeded without the benefit of counsel.

Claralyn's mother, Ranona, consented to the appointment of her father and stepmother as guardians of Claralyn. The basis for the guardianship petition was that, because of the unfortunate circumstances, Claralyn had spent the majority of her life with her grandparents and each of the known parents was unfit to care for the child.

Over Gary's objection, the grandparents received temporary custody of Claralyn. At the hearing on temporary custody, Ranona had testified under oath that Gary was not the natural father of Claralyn and that at the time of conception she was living out of state, while Gary was living in California. Thus, the grandparents moved the court to order blood tests to determine parentage. After the trial court ordered the tests be administered, it appointed the office of public defender to represent Claralyn during the proceedings.

The blood tests revealed that Gary could not be the father of Claralyn. Gary's counsel moved to have the blood tests retaken. The motion was based on the claim that there was a break in the chain of evidence and that Gary's blood drawn for testing might have been lost or otherwise tampered with by laboratory personnel. Claralyn's court-appointed counsel joined in the motion. The dispute was resolved by a stipulation that a second set of blood tests be taken, the costs being borne jointly by the County of Stanislaus and Gary.

The second set of test results also excluded Gary as the natural father of Claralyn. These tests results were received into evidence.

When the focus at trial was switched to claims of res judicata and collateral estoppel, the District Attorney of the County of Stanislaus was joined as a party to protect the county's interest in the two prior judgments against Gary.

At the conclusion of the evidence, the grandparents contended that they were not precluded from litigating paternity by res judicata or collateral estoppel because they had not been parties to any prior action in which Gary had stipulated to being the father of Claralyn. Neither had they controlled any prior litigation. Counsel for Claralyn took the position that the grandparents could not litigate the paternity issue because the conclusion compelled by the evidence would have the disfavored effect of bastardizing the minor child. The County of Stanislaus took the view that once a paternity judgment has been entered, it becomes an in rem judgment which is conclusive on all persons. Gary took the position that the grandparents' intent to litigate the issue of paternity was an impermissible attempt to bastardize Claralyn. Gary also contended that Ranona had been peripherally involved

in the prior actions and was related to the grandparents; therefore, she represented the whole family and thus bound the grandparents to any judgment of paternity.

The trial court ruled in the grandparents' favor on the issues directly involved in the guardianship action, finding that the grandparents had established a close relationship with Claralyn and that the removal of Claralyn from their home and placement in Gary's home would be detrimental to the child. However, the trial court rejected the grandparents' challenge to Gary's paternity claims. The trial court found that the two prior judgments in which Gary admitted the paternity were res judicata and barred further litigation of the issue.

DISCUSSION

 Appellants contend that the trial court improperly precluded them from litigating the issue of Claralyn's paternity. We reject appellants' contention and conclude for public policy reasons the judgment should be affirmed.

Appellants are correct in their determination that the doctrines of res judicata and collateral estoppel may not properly be invoked against them as they were not parties or privies in the prior actions brought by the county against Gary for reimbursement of child support. However, these doctrines are grounded in public policy and we believe that the public policies of maintaining parent-child relationships and insuring the finality of paternity judgments (see *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]; *De Weese* v. *Unick* (1980) 102 Cal.App.3d 100, 107 [162 Cal.Rptr. 259]) should prevail over the doctrines of res judicata and collateral estoppel. In the instant case, if Gary sought to deny paternity based on the new blood test, it is quite apparent that he would be estopped to deny that he was the father of Claralyn. Clearly, in a further action brought by the county he would be estopped by the doctrines of res judicata and collateral estoppel from asserting that he was not the father of Claralyn. (*De Weese* v. *Unick, supra,* 102 Cal.App.3d 100.) Is it fair to bind Gary to the finding of paternity but not bind others? We do not think so, especially since Claralyn is old enough to have established a relationship with her father, Gary.

 The best interests of the child are always paramount in any of the numerous proceedings, such as the one before us, that determine the custody of the child. (*In re B. G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244]; Civ. Code, § 4600.) This is so, we believe, because a determination of custody and visitation rights goes to the very heart of the

child's identity and fundamental bond to its parents. Families establish lives based on these judgments.

Once paternity has been established in a court proceeding and the judgment is final, it has been held that the child, if the child was not a party in those proceedings, may challenge the judgment. (*Ruddock* v. *Ohls* (1979) 91 Cal.App.3d 271 [154 Cal.Rptr. 87].) In the instant case, Claralyn is not challenging paternity and agrees with the trial court's granting custody to appellants and visitation rights to her father. Nor is her father challenging the trial court's order granting custody to appellants and visitation to him.

The evidence amply supports his position that he is the person she has known as her father from the time of her birth—that he has acted as her father and that he has supported and cared for her. It is clear that Claralyn's best interests would not be furthered by continuing litigation on the issue of paternity. To be sure, if the blood test were admitted, Claralyn would lose the stability of a father-daughter relationship with Gary and carry with her its attendant psychological complications for years to come.

Moreover, we believe Evidence Code section 621 and Civil Code section 7010, subdivision (a), demonstrate, in general, a strong public policy in the finality of paternity actions. Evidence Code section 621 codifies the finality of paternity judgments by setting a two-year statute of limitations during which a father may challenge the paternity of a child born during the marriage in which the partners are cohabiting. If there is no challenge within this time, paternity is a conclusive presumption. Civil Code section 7010, subdivision (a), states, "The judgment or order of the court determining the existence or nonexistence of the parent and child relationship is *determinative* for all purposes except for actions brought pursuant to Section 270 of the Penal Code." (Italics added.)

The legislative reasoning for Evidence Code section 621 was set forth in a Stanford Law Review article entitled *California's Tangled Web: Blood Tests and the Conclusive Presumption of Legitimacy* (1968) 20 Stan.L.Rev. 754, 761. The article states the following: "In the case of a young child the most palpable relation that anyone has to the child is a biological relationship. The child has no personality, he can communicate with no one, and no one can be said to have exercised a formative influence on his character. *But in the case of an older child the familial relationship between the child and the man purporting to be the child's father is considerably more palpable than the biological relationship of actual paternity.* A man who has lived with a child, treating it as his son or daughter, has developed a relationship with the child that should not be lightly dissolved . . . . *This social*

*relationship is much more important, to the child at least, than a biological relationship of actual paternity."* (Italics added.)

It is not disputed that Claralyn identifies Gary as her father and Gary regards Claralyn as his daughter. It is in the best interests of all parties that this parent-child relationship not be disrupted.

The judgment is affirmed.

Franson, Acting P. J., concurred.

**HANSON (P. D.), J.**—I respectfully dissent.

The best interests of the child are crucial; they must be decided on the trial level, not by the Court of Appeal. The trial court recognized that Claralyn should not reside with Gary but allowed Gary visitation. As a former stepfather having an interest in Claralyn's welfare, Gary may pursue his visitation right even if declared not to be the natural father. (Civ. Code, § 4601.)

Claralyn, eight years old, very well could disagree with the court's conclusion to deny admission of the blood tests as she grows older. The trial court has indicated that neither Gary nor Ranona can provide the stable residential setting to which the child is entitled. The trial court should admit the blood test evidence, protect and carefully *explain* to Claralyn the child's right to continue a relationship with Gary if she wishes, but provide the grandparents an avenue by which to proceed toward permanency in providing a stable home for Claralyn.

A public-policy argument supporting the finality of paternity judgments in this case is questionable, recognizing that the majority's conclusion will place child, mother, father and grandparents into a lockstep determination, unassailable in the future, when the very cornerstone of the decision is based upon an erroneous premise that Gary is the father of Claralyn. This conclusion affects "the most fundamental right a child possesses in our system of jurisprudence." (*Ruddock v. Ohls* (1979) 91 Cal.App.3d 271, 278 [154 Cal.Rptr. 87].)

As the majority recognizes, Claralyn's grandparents are not barred from litigating Claralyn's paternity by the doctrines of res judicata or collateral estoppel. The grandparents were not parties or privies with Gary in the prior actions and Ranona was not a party in those actions. Not only is there no showing in the record that the grandparents were given notice and an ade-

quate opportunity to be heard, but the grandparents had no standing to assert nonpaternity in the prior actions.

I would reverse and remand for a full hearing on paternity with the best interests and the future of the child the prime concern of the court.

Appellants' petition for a hearing by the Supreme Court was denied December 15, 1983. Bird, C. J., was of the opinion that the petition should be granted.